Brianne C. McClafferty
Holland & Hart LLP
401 North 31st Street, Suite 1500, P. O. Box 639
Billings, Montana 59103-0639
Telephone: (406) 252-2166
Fax: (406) 252-1669
Email: bcmcclafferty@hollandhart.com

Matthew J. Smith (*pro hac vice request pending*)
Nicholas W. Katz (*pro hac vice request pending*)
Holland & Hart LLP
555 17th Street, Suite 3200
Denver, Colorado 80202
Telephone: (303) 295-8539
Fax: (303) 479-9424
Email: mjsmith@hollandhart.com; nwkatz@hollandhart.com

ATTORNEYS FOR PLAINTIFF

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION**

| | |
|---|---|
| BRIDGER TANKER, LLC, a Montana limited liability company, <br><br> Plaintiff, <br><br> vs. <br><br> 10 TANKER AIR CARRIER, LLC, a Nevada limited liability company, 10 TANKER AIR CARRIER HOLDINGS, LLC, a Nevada limited liability company, BC AIRCRAFT LEASING HOLDINGS, LLC, a Nevada limited liability company, 10 TANKER-STC HOLDINGS, LLC, a Nevada limited liability company, <br><br> Defendants. | No. CV-23-25-BU-BMM-JTJ <br><br> **COMPLAINT AND DEMAND FOR JURY TRIAL** |

1

Plaintiff Bridger Tanker, LLC ("Bridger"), by and through its counsel of record, Holland & Hart LLP, for its Complaint, states and alleges as follows:

## I.     NATURE OF ACTION

1.     Montana faces a growing threat of economic and environmental havoc caused by wildfires. The most effective way to combat those wildfires is via aerial firefighting support deployed in conjunction with ground-based firefighters.

2.     Bridger is an aerial firefighting company based in Belgrade, Montana, and operating out of the Bozeman Yellowstone Airport. It was founded in 2014 to support front-line firefighters with world-leading technology and aerial fire suppression systems. It has grown from operating a single plane to commanding a significant "Air Attack" fleet and the largest "Super Scooper" fleet in the United States, all in less than eight years. Bridger's mission is to save the lives, property, and habitats affected by wildfires.

3.     Recently, Bridger sought to further its mission and expand its business by acquiring 10 Tanker Air Carrier, LLC ("10 Tanker"), a New Mexico-based aerial firefighting company with global operations, including operations in Montana on a seasonal basis.

4.     To that end, Bridger entered into a partially binding term sheet with 10 Tanker and its owners. The term sheet outlined Bridger's prospective

2

acquisition of 10 Tanker for ███████, and Bridger deposited ███████ into an escrow account as a measure of its good faith intention to pursue the transaction.

5. In the agreed-upon due diligence period, however, Bridger discovered numerous undisclosed liabilities and transactions impacting the financial feasibility of the contemplated acquisition. ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████

6. After making these discoveries, Bridger sought to salvage the prospective transaction by offering 10 Tanker and its owners terms that accounted for the company's diminished stature. 10 Tanker and its owners refused to negotiate, however, instead insisting that the deal was off and that they were entitled to keep Bridger's escrow deposit. Bridger was left with no choice but to terminate the term sheet.

7. Fortunately for Bridger, the term sheet expressly and unambiguously dictates what happens under these circumstances: ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████ Bridger is entitled to the return of its escrowed funds. While either of the foregoing present circumstances is individually sufficient to entitle Bridger to its escrowed funds in accordance with the term sheet, 10 Tanker and its owners have refused to honor those terms, leading to this lawsuit.

## II.    THE PARTIES

8.      Plaintiff Bridger Tanker, LLC is a Montana limited liability company. For jurisdictional purposes, Bridger is owned by a Delaware corporation headquartered in Montana.

9.      Defendant 10 Tanker Air Carrier, LLC is a Nevada limited liability company. Upon information and belief, 10 Tanker's sole member is Defendant 10 Tanker Air Carrier Holdings, LLC.

10.     Defendant 10 Tanker Air Carrier Holdings, LLC is a Nevada limited liability company. Upon information and belief, none of its members are residents or citizens of the States of Montana or Delaware.

11.     Defendant BC Aircraft Leasing Holdings, LLC is a Nevada limited liability company. Upon information and belief, none of its members are residents or citizens of the States of Montana or Delaware.

4

12.     Defendant 10 Tanker-STC Holdings, LLC is a Nevada limited liability company. Upon information and belief, none of its members are residents or citizens of the States of Montana or Delaware.

13.     Defendants BC Aircraft Leasing Holdings, LLC and 10 Tanker-STC Holdings, LLC are affiliates of 10 Tanker. Along with Defendant 10 Tanker Air Carrier Holdings, LLC, these entities are referred to herein as the "Sellers."

### III.   JURISDICTION AND VENUE

14.     This Court has jurisdiction over the parties and controversy pursuant to 28 U.S.C. § 1332 because the amount in controversy is greater than $75,000 and the adverse parties are citizens of different states.

15.     This Court also has jurisdiction over the parties and controversy pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. §§ 2201 and 2202, as Bridger is an interested party seeking declarations of its rights and other legal outcomes as against 10 Tanker and the Sellers. The requested declaration applies to property worth in excess of $75,000.

16.     Venue for this suit is proper pursuant to Montana Code Annotated § 25-2-121. The causes of action in this case arose from the performance of a contract that was negotiated in Montana, partially performed in Montana, and intended to further the Montana-based business operations of a Montana company.

17.     Defendants have availed themselves of Montana in various ways, including by traveling to Montana several times for pre- and post-term sheet negotiations and related discussions with respect to the proposed transaction. Defendants have further caused events of important consequences to happen in Montana, namely, harm to a Montana LLC and the attempt to eliminate a contract with consequences in Montana. The consequences of Defendants' actions occur in Montana as they damage a Montana LLC. Finally, Defendants' actions are substantially connected to Montana as they strike at the heart of a contract executed by a Montana LLC to further its business in Montana.

18.     Divisional venue for this suit is proper pursuant to Local Rule 1.2(c)(2).

## IV.   FACTS

19.     Bridger incorporates all prior allegations herein.

***Bridger Enters a Term Sheet to Conduct Due Diligence with the Goal of Acquiring 10 Tanker***

20.     Following in-person negotiations held in Montana and attended by 10 Tanker's founder, Bridger, 10 Tanker, and the Sellers entered into a Confidential Binding Term Sheet, dated May 25, 2022 (the "Term Sheet"), that set forth terms giving Bridger the exclusive right to acquire all of the business, assets, and operations of 10 Tanker and of any of 10 Tanker's affiliates that hold assets or

operations utilized in 10 Tanker's aerial firefighting business. A copy of the Term Sheet is attached as **Exhibit 1**.

21. The Term Sheet is expressly divided into binding provisions and non-binding provisions, ███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

█████████████

22. A non-binding provision described the structure of the contemplated transaction: ████████████████████████████ Bridger was to acquire 10 Tanker's and its affiliates' leasing and operating entities and assets, including but not limited to all aircraft, engines, auxiliary power units, parts, ground support equipment of any kind, office equipment and furniture, as well as the transfer of all leases, contracts, and agreements related to 10 Tanker's business or operations. Ex. 1 at 1. In exchange, Bridger was to pay the Sellers ████████ (the "Purchase Price"). *Id.*

23. ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████ Ex. 1 at 1.

24.    In a binding provision, ██████████████████████████████████

█████████████████████████████████████████████ Bridger agreed to deposit

████████ into a dedicated escrow account under the joint control of Bridger and

the Sellers. Ex. 1 at 1 (emphasis added).

25.    ████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████ Ex. 1 at 2.

26.    During that due diligence period and until the proposed transaction

was consummated by the parties, 10 Tanker and its affiliates were required to

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

████████ Ex. 1 at 2. This was a binding provision. *Id.* at 4.

27.    ████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████ These binding provisions together with the binding

provisions described in the immediately preceding paragraph were collectively

known as the "Ordinary Course Provisions." *Id.*

28.   To further Bridger's due diligence investigation, 10 Tanker also

agreed to provide Bridger with its audited financial statements for year-end 2019,

2020, and 2021, as well as all additional due diligence materials reasonably

requested by Bridger. Ex. 1 at 2.

29.   Recognizing that negotiations on a final deal would be ongoing and

would depend on the results of Bridger's due diligence investigation, the parties

agreed in a non-binding provision that the actual acquisition of 10 Tanker would be

contingent on the execution of a subsequent, definitive acquisition agreement

containing terms and conditions satisfactory to each of Bridger, 10 Tanker, and the

Sellers (the "Acquisition Agreement"). Ex. 1 at 3.

***Bridger Deposits the Escrow Funds, Begins Its Due Diligence, and, in Reliance on the Sellers' Assurances, Starts Negotiations on the Acquisition Agreement***

30.   After the parties executed the Term Sheet, Bridger deposited the

██████████ escrow sum into a dedicated escrow account with a neutral third party.

Bridger agreed to pay all fees and expenses of the escrow agent with respect to the

escrow agreement establishing the escrow account.

31.    That done, Bridger began its due diligence investigation of 10 Tanker, devoting substantial time and resources to the endeavor.

32.    At the outset, 10 Tanker and the Sellers assured Bridger that there were no transactions outside of the ordinary course and no material liabilities that would impact the proposed deal. In reliance on these representations, Bridger agreed to begin drafting and discussing the Acquisition Agreement in parallel with its due diligence investigation. These discussions included at least one in-person meeting that took place in Montana and was attended by 10 Tanker President and CEO John Gould.

33.    While its due diligence investigation was ongoing, Bridger engaged legal counsel to draft and negotiate the terms of the Acquisition Agreement, incurring significant expenses in time and resources, including attorney fees, in doing so.

### Bridger's Due Diligence Investigation Reveals Fundamental Problems

34.    In negotiating the Term Sheet, 10 Tanker and the Sellers had not disclosed any material liabilities and continued to represent that there were none, leading Bridger to believe there would be no hang-ups revealed in due diligence.

35.    In the course of its due diligence investigation, however, Bridger was shocked to discover a laundry list of material misstatements and non-disclosures by 10 Tanker and the Sellers:

a.    **Missing Engines:** The acquisition of 10 Tanker's fire-fighting aircraft was a primary component of the proposed deal, and 10 Tanker and the Sellers had not disclosed any concerns related to their fleet's engines as previously represented by 10 Tanker and the Sellers. ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

████████████████████████████ It would also leave Bridger unable to cover irregular operations, possibly diminishing revenue opportunities.

b.    **Unpaid Engine Repair Bills:** ████████████████████

██████████████████████████████

████████████████████████████████████████

████████████████████████████ Bridger estimated these costs to be at least $3 million.

c.    **Grounded Planes:** ████████████████████

████████████████████████████████████████

11

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████ Bridger estimates

these expenses to be, at a minimum, $1.5 million per year.

        d.     **Defective Flight Simulator:** Flight simulators are necessary to

train pilots on how to fly and operate 10 Tanker's large transport-category fire-

fighting aircraft, because training in the actual aircraft is extremely expensive and

implicates significant safety concerns. ████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

        e.     **Increased Operating Expenses:** Following the execution of

the Term Sheet, ████████████████████████████████████████ .

without notifying Bridger or seeking its approval. The result: an undisclosed increase in annual operating expense liabilities of at least $500,000.

36.    Both individually and collectively, these expenditures and transactions constituted a failure by 10 Tanker and the Sellers to conduct business for 10 Tanker in compliance with the Ordinary Course Provisions.

37.    Specifically, these actions (i) constitute a failure by 10 Tanker and the Sellers to maintain their operations and assets in serviceable condition, and/or (ii) represent transactions outside of the ordinary course exceeding $1 million in the aggregate, and they were taken without notice to, and agreement by, Bridger in accordance with the Term Sheet. Further, these issues individually and collectively constitute material liabilities greater than $500,000.

***An Independent Review Reveals Even Greater Undisclosed Liabilities***

38.    As part of Bridger's due diligence investigation, Bridger engaged PwC to conduct an independent review of 10 Tanker's and the Sellers' financial statements. Per the Term Sheet, 10 Tanker and the Sellers were to deliver such statements to Bridger no later than June 30, 2022. However, 10 Tanker and the Sellers failed to timely deliver the financial statements.

39.    When Bridger finally received the 10 Tanker financial statements in February 2023 and PwC was finally able to conduct its review, it revealed additional undisclosed material liabilities impacting the value of 10 Tanker.

13

40. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████████████

41. In ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████

42. ████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

14

████████████████████████████████████████████████████

████████████████████████████████████████████

43.   ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

44.    As with the engine and landing gear problems with the 10 Tanker fleet, 10 Tanker and the Sellers failed to disclose these material tax liabilities either before or after the parties executed the Term Sheet, and these liabilities were only discovered in February/March 2023 as a result of the independent tax advisors' review as part of Bridger's due diligence investigation.

45.    In addition to constituting undisclosed material liabilities, the failure by 10 Tanker and the Sellers to pay the taxes due would have a material effect on the after-tax profitability of 10 Tanker's operations as compared to the profitability represented to Bridger by 10 Tanker and the Sellers.

***Bridger Continues Negotiations, But the Sellers Refuse and Claim Entitlement to Bridger's Escrowed Funds***

46.    Collectively, the liabilities discovered by Bridger significantly undermined the value of the proposed transaction. Nonetheless, Bridger remained committed and sought to continue to pursue the transaction on terms that reflected

15

the effect the discovered liabilities had on the valuation of 10 Tanker and the contemplated Purchase Price.

47.    To that end, on March 18, 2023, Bridger sent 10 Tanker and the Sellers a new, Non-Binding Term Sheet to build upon the terms of the original Term Sheet. In the Non-Binding Term Sheet, Bridger proposed a modified valuation of 10 Tanker and a modified transaction structure that included a cash component, a stock component, and a free cash flow distributions component.

48.    Bridger encouraged 10 Tanker and the Sellers to consider the modified transaction structure and engage in continued conversations and negotiations to consummate the deal despite the changed circumstances revealed by Bridger's due diligence investigation.

49.    Bridger expected 10 Tanker and the Sellers to respond with continued negotiations on the terms for the transaction valuation and structure. Instead, less than 48 hours after receiving Bridger's proposal, 10 Tanker and the Sellers sent Bridger a formal demand letter deeming Bridger's proposal for continued negotiations a termination of the Term Sheet and claiming entitlement to Bridger's ███████ in escrowed funds as liquidated damages.

50.    This response was, at best, perplexing. Although Bridger had proposed a modified Purchase Price to reflect the modified valuation, that was consistent with the parties' agreement in the Term Sheet ████████████

16

███████████████████████████████████████████████

███████████████████████████████████████ Ex. 1 at 1. Indeed,

nothing in Bridger's proposal had indicated an intention to terminate the Term

Sheet or walk away from the contemplated transaction despite having numerous

"Permitted Reasons" to do so. To the contrary, Bridger had confirmed its intention

to proceed, encouraging and requesting additional evaluation and discussion on the

proposed modified terms.

51.    In refusing to negotiate and instead demanding Bridger's escrowed

funds, 10 Tanker and the Sellers made clear that they were no longer interested in

the contemplated transaction and were instead hoping to cut bait and walk away

with a ███████ windfall.

***Bridger Terminates the Term Sheet Based on 10 Tanker's Failure to Comply
with the Ordinary Course Provisions and the Discovery of Undisclosed Material
Liabilities, Entitling Bridger to the Return of Its Escrowed Funds***

52.    Stonewalled by 10 Tanker and the Sellers' refusal to continue

negotiations, Bridger was left with no choice but to terminate the Term Sheet.

53.    ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████



54.    Pursuant to these provisions, Bridger provided written notice to 10 Tanker and the Sellers that it was exercising its right to terminate the Term Sheet based on 10 Tanker's failure to conduct its business in the ordinary course in compliance with the Ordinary Course Provisions and based on the discovery of material liabilities (greater than $500,000 or an aggregate amount that would affect the Purchase Price).

55.    In its termination letter, Bridger noted that the termination entitled Bridger to the return of its escrowed funds and requested that 10 Tanker and the Sellers execute an instruction to the escrow agent approving the release of the funds to Bridger.

56.    █████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████

57.    Instead of complying with their obligation to release the escrowed funds to Bridger, 10 Tanker and the Sellers dug their heels in and refused. As a

result, Bridger's escrowed funds remain in the possession of the escrow agent and will be held in limbo until this dispute is resolved.

58.    10 Tanker and the Sellers' failure to comply with their obligations under the Term Sheet have harmed Bridger in a total amount to be proven at trial. The monetary harm includes, among other things, actual costs incurred, substantial lost time and opportunity, reputational harm, lost investments, and, most importantly, the loss of a significant business opportunity.

59.    ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

## V.    CLAIMS FOR RELIEF AGAINST ALL DEFENDANTS

### COUNT I
### DECLARATORY JUDGMENT

60.    Bridger incorporates by reference each and every above allegation as if set forth in full here.

61.    ████████████████   Bridger's funds are currently held in an escrow account pursuant to the Term Sheet.

19

62.    A present controversy exists between the parties regarding the rights of Bridger, 10 Tanker, and the Sellers as to the release of the escrowed funds following the termination of the Term Sheet.

63.    The Term Sheet includes binding provisions that constitute a valid and enforceable contract.

64.    Bridger substantially performed its obligations under the Term Sheet or was excused from such performance.

65.    Bridger has terminated the Term Sheet for a Permitted Reason, and the Sellers have failed to enter into the Acquisition Agreement. Under these circumstances the Term Sheet dictates that the escrowed funds are to be released to Bridger.

66.    10 Tanker and the Sellers have refused to allow the escrow agent to release the escrowed funds to Bridger, in contravention of the Term Sheet.

67.    Bridger requests a declaration that under the unambiguous terms of the Term Sheet, 10 Tanker and the Sellers are obligated to approve the release of the escrowed funds to Bridger.

## COUNT II
## SPECIFIC PERFORMANCE

68.    Bridger incorporates by reference each and every above allegation as if set forth in full here.

69.     The Term Sheet includes binding provisions that constitute a valid and enforceable contract.

70.     Bridger substantially performed its obligations under the Term Sheet or was excused from such performance.

71.     Bridger has terminated the Term Sheet for a Permitted Reason, and the Sellers have failed to enter into the Acquisition Agreement. Under these circumstances the Term Sheet dictates that the escrowed funds are to be released to Bridger.

72.     10 Tanker and the Sellers have refused to allow the escrow agent to release the escrowed funds to Bridger, in contravention of the Term Sheet.

73.     Bridger has been injured by 10 Tanker and the Sellers' wrongful prevention of the release of the escrowed funds to Bridger.

74.     In the Term Sheet, the parties acknowledged and agreed that each party shall be entitled to an injunction, specific performance, and other equitable relief to prevent breaches of the binding provisions of the Term Sheet and to enforce specifically the terms and provisions of the Term Sheet, in addition to any other remedy available at law or in equity.

75.     Bridger is entitled to an order of specific performance requiring 10 Tanker and the Sellers to approve the release of the escrowed funds to Bridger.

## COUNT III
## INJUNCTIVE RELIEF

76.     Bridger incorporates by reference each and every above allegation as if set forth in full here.

77.     In the Term Sheet, the parties acknowledged and agreed that each party shall be entitled to an injunction, specific performance, and other equitable relief to prevent breaches of the binding provisions of the Term Sheet and to enforce specifically the terms and provisions of the Term Sheet, in addition to any other remedy available at law or in equity.

78.     Bridger is entitled to injunctive relief as it has demonstrated a substantial likelihood of success on the merits of its claims.

79.     Based on the parties' agreement in the Term Sheet as to the entitlement to injunctive relief to prevent breaches of the binding provisions of the Term Sheet and to enforce specifically the terms and provisions of the Term Sheet, irreparable harm to Bridger and the lack of an adequate remedy at law are presumed in connection with 10 Tanker and the Sellers' actions preventing the release of Bridger's escrowed funds in violation of the Term Sheet.

80.     Bridger is entitled to temporary and preliminary injunctions ordering that 10 Tanker and the Sellers be enjoined from directly or indirectly preventing the release of the escrowed funds in violation of the terms and provisions of the Term Sheet pending the outcome of this litigation or further Order of this Court.

## COUNT IV
## BREACH OF CONTRACT

81.     Bridger incorporates by reference each and every above allegation as if set forth in full here.

82.     The Term Sheet includes binding provisions that constitute a valid and enforceable contract.

83.     Bridger substantially performed its obligations under the Term Sheet or was excused from such performance.

84.     10 Tanker and the Sellers breached the Term Sheet by consummating transactions outside of the ordinary course exceeding $1 million individually or in the aggregate other than following notice to and agreement by Bridger.

85.     10 Tanker and the Sellers breached the Term Sheet by failing to notify Bridger with respect to all ordinary course transactions, investments, and dispositions exceeding $1 million individually or in the aggregate.

86.     Following these breaches, Bridger terminated the Term Sheet for a Permitted Reason, and the Sellers have failed to enter into the Acquisition Agreement. Under these circumstances the Term Sheet dictates that the escrowed funds are to be released to Bridger.

87.     10 Tanker and the Sellers have further breached the Term Sheet by preventing the release of the escrowed funds to Bridger.

88.    10 Tanker and the Sellers have further breached the Term Sheet by acts to be proven at trial.

89.    10 Tanker and the Sellers' breaches of the Term Sheet directly caused damage to Bridger.

## COUNT V
## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

90.    Bridger incorporates by reference each and every above allegation as if set forth in full here.

91.    The Term Sheet includes an implied duty of good faith and fair dealing to enforce the parties' reasonable expectations.

92.    Bridger substantially performed its obligations under the Term Sheet or was excused from such performance.

93.    10 Tanker and the Sellers breached the duty of good faith and fair dealing and acted outside Bridger's reasonable expectations by refusing to negotiate and execute the Acquisition Agreement with Bridger.

94.    10 Tanker and the Sellers further breached the duty of good faith and fair dealing by hiding from Bridger transactions outside of the ordinary course of business and not disclosing to Bridger material liabilities affecting the Purchase Price, knowing that Bridger had detrimentally relied on 10 Tanker and the Sellers' representations, as described in detail above.

95.    10 Tanker and the Sellers further breached the duty of good faith and fair dealing by preventing the release of the escrowed funds to Bridger.

96.    10 Tanker and the Sellers also breached the duty of good faith and fair dealing by further acts to be proven at trial.

97.    10 Tanker and the Sellers' breaches of the duty of good faith and fair dealing directly caused damage to Bridger.

## VI.    REQUEST FOR RELIEF

WHEREFORE, Bridger requests judgment in its favor and against 10 Tanker and the Sellers as follows:

A.    for Count I, a declaration that Bridger is entitled to the return of its escrowed funds in full;

B.    for Count II, an order of specific performance requiring 10 Tanker and the Sellers to approve the release of the escrowed funds to Bridger;

C.    for Count III, temporary and preliminary injunctions ordering that 10 Tanker and the Sellers be enjoined from directly or indirectly preventing the release of the escrowed funds in violation of the terms and provisions of the Term Sheet pending the outcome of this litigation or further Order of this Court;

D.    for Counts IV and V, money damages against 10 Tanker and the Sellers jointly and severally, in an amount to be proved at trial;

E.    for interest, attorney fees, and costs as allowed by law; and

F.      for all such further relief as the Court may deem just and proper.

## VII.   **<u>DEMAND FOR JURY TRIAL</u>**

Bridger demands a trial by jury on all issues so triable.

Dated this 24th day of April, 2023.

/s/ *Matthew J. Smith*
Matthew J. Smith (*pro hac vice request pending*)
Nicholas W. Katz (*pro hac vice request pending*)

/s/ *Brianne C. McClafferty*
Brianne C. McClafferty
Holland & Hart LLP

Attorneys for Plaintiff

21290314_v7